*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0156P (6th Cir.)
File Name: 00a0156p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GABE CANARY,
        *Plaintiff-Appellee,*

        v.

H. GARRY OSBORN, BOARD
OF EDUCATION, PORTSMOUTH
CITY SCHOOL DISTRICT,
        *Defendants,*

OTTO F. APEL, III, PHYLLIS
FULLER, ROBERT STEVENS,
STEVE STURGILL, WALTER R.
HICKMAN, JR.,
        *Defendants-Appellants.*

No. 98-4218



Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
Nos. 95-00944; 96-00253—Susan J. Dlott,
District Judge.

Argued: March 8, 2000

Decided and Filed: May 3, 2000

Before: WELLFORD, SILER, and GILMAN, Circuit
Judges.

1

—————————

**COUNSEL**

—————————

**ARGUED:** Bernard W. Wharton, McCASLIN, IMBUS & McCASLIN, Cincinnati, Ohio, for Appellants.  David G. Torchia, TOBIAS, KRAUS & TORCHIA, Cincinnati, Ohio, for Appellee.  **ON BRIEF:** Bernard W. Wharton, R. Gary Winters, McCASLIN, IMBUS & McCASLIN, Cincinnati, Ohio, for Appellants.  David G. Torchia, TOBIAS, KRAUS & TORCHIA, Cincinnati, Ohio, for Appellee.

—————————

**OPINION**

—————————

RONALD LEE GILMAN, Circuit Judge.  The sole issue in this interlocutory appeal is whether the individual members of the Portsmouth (Ohio) City School District Board of Education are entitled to absolute legislative immunity under *Bogan v. Scott-Harris*, 523 U.S. 44 (1998), for their role in voting against the renewal of Gabe Canary's contract as an assistant principal.  Among other grounds, Canary brought suit under 42 U.S.C. § 1983 on the basis that the defendants violated his constitutional rights when they demoted him in alleged retaliation for his "blowing the whistle" on a suspected cheating scheme involving student achievement tests. The defendants appeal the district court's denial of their motion for summary judgment, which was based on an assertion of absolute legislative immunity. For the reasons set forth below, we **AFFIRM** the judgment of the district court and **REMAND** the case for further proceedings not inconsistent with this opinion.

## I.  BACKGROUND

### A.  Factual background

Canary was hired by the Board in 1985 to serve as an assistant principal.  He worked at the McKinley Middle

that job's duties to a new employee to perform." *In re Appeal of Woods*, 455 N.E.2d 13, 15 (Ohio Ct. App. 1982).

### III.  CONCLUSION

For all of the reasons set forth above, the Board members failed to carry their burden of establishing that they were entitled to summary judgment on their claim of legislative immunity.  We therefore **AFFIRM** the judgment of the district court and **REMAND** the case for further proceedings not inconsistent with this opinion.

Second, the resolution did not "involve the termination of a position." There is no indication in the minutes of the meeting that Canary's contract was not renewed because the Board no longer needed or wanted an assistant principal at Portsmouth East. The defendants argue in their appeal that their action was legislative because they "eliminat[ed] all assistant principal positions within the . . . School District . . . ." This argument, however, is questionable in light of the record of the meeting itself. In the "appointment[s]/reappointment[s]" section, the minutes reflect that two individuals, Michael Flaig and John Hendricks, were either appointed or reappointed to serve as "assistant principals" in the School District for the coming school year.

Finally, unlike in *Bogan*, the record reflects that the alleged action in this case did not have "prospective implications that reach[ed] well beyond the particular occupant of the office." Shortly after Canary's contract expired, the Board created a new "student facilitator" position at Portsmouth East and hired someone other than Canary to fill it. *Cf. Rateree*, 852 F.2d at 950 (noting, in support of a finding that certain budget cuts were indeed legislative in nature, that "the plaintiffs' positions were eliminated altogether and no one was hired to replace them"). Although the defendants contend that such a position did not require administrator-level certification, the duties of these "facilitators," which Osborn described during his deposition, are quite similar to those of an assistant principal.

Thus, the decision at issue did not necessarily have "prospective [budgetary] implications" beyond Canary himself. *See Campana v. City of Greenfield*, 38 F. Supp. 2d 1043, 1049 (E.D. Wis. 1999) (holding that the council members' vote authorizing the city mayor to suspend the city treasurer was not legislative in nature because the action "had no implications for the position of city treasurer in general" and was "focused on the discipline of a particular city employee"). Furthermore, "[a] job is not abolished under circumstances where the appointing authority simply transfers

School and at the Portsmouth East High School during the 1992-1993 and 1993-1994 school years, respectively. In addition to McKinley and Portsmouth East, the School District includes the Harding and Wilson elementary schools. At all times relevant to this case, the Board consisted of Otto F. Apel, III, Phyllis Fuller, Walter R. Hickman, Jr., Robert Stevens, and Steve Sturgill. H. Garry Osborn served as the Superintendent of the School District.

In November of 1992, while working as the Assistant Principal of McKinley, Canary attended a district-wide meeting of various Portsmouth administrators. Among those in attendance were Wanda Kinker, the Principal of Harding, and Mike Welton, who at the time was the Principal of McKinley and Canary's immediate superior. During this meeting, the administrators discussed ideas for increasing the students' achievement test scores. In an affidavit filed with the district court, Canary asserts that the following exchange took place:

> Kinker stated that she would be coming to the schools in the district and [would be] exhibiting actual tests and answers to the principals for review. She said principals would be allowed to copy the questions by hand, and then could go over them with teachers in their [respective] schools. I immediately objected to this because it was cheating and I was aware of a case in North Carolina where teachers had their certificates taken away for doing the same thing. Kinker said she had been doing this for years and that if anyone objected, she had gotten rid of them.

> . . . Welton was asked if he would allow this to be done at McKinley . . . . He stated that I was in charge of testing and that we would not allow cheating at McKinley.

Despite Canary's and Welton's stated objections at the November 1992 meeting, Canary came to believe that "actual tests had been shown to and hand-copied by teachers at Wilson . . . ." As a result, Canary wrote to E. Roger Trent,

then Director of the Division of Educational Services at the Ohio Department of Education.  In his letter, Canary recounted part of the November 1992 meeting and requested an investigation into the matter.  Specifically, he wrote as follows:

It is common knowledge here that the cheating was directed from the superintendent aids [sic], and they indicated that they had been told to do so.

. . .

I feel certain that an investigation will reveal a conspiracy to cheat that includes "top personnel" and possibly board members.

I feel certain that a cover-up is now taking place.

I feel certain that plans are being made to retaliate against myself and Mr. Welton based on statements . . . made to me and others.

As a result of Canary's letter, Trent notified Osborn that his office had received allegations of possible test security violations.  He requested that Osborn conduct an investigation and issue a written report of any action taken in response.  Osborn complied with Trent's initial request by engaging Richard Ross, the School District's attorney, to conduct an investigation into the matter.  Ross interviewed various administrators, including Canary, in connection with his probe.  During Canary's interview, Ross allegedly accused Canary of "being insubordinate for not going along with the testing procedure . . . ."

Sometime between April and July of 1993, Ross submitted a written report to Trent.  After reviewing Ross's assessment, Trent communicated his conclusions to the School District, via Ross, in a letter dated July 23, 1993.  He found that "the district was NOT in compliance with one of the fundamental provisions of Rule 3301-12-06 [of the Administrative Code]: the requirement that each district establish written procedures

reflected a discretionary, policymaking decision *implicating the budgetary priorities of the city and the services the city provides to its constituents*.  Moreover, *it involved the termination of a position*, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office.

*Id.* at 55-56 (emphasis added).

Based on the above considerations, it becomes evident that the members of the Board in the present case are not entitled to summary judgment on their claim of legislative immunity.  Even "stripped of all considerations of intent and motive," the action in substance was not essentially and clearly legislative.  Unlike the ordinance in *Bogan*, the resolution proposed by Osborn and adopted by the Board to not renew Canary's contract did not "b[ear] all the hallmarks of traditional legislation."

First, despite the fact that the minutes of the Board meeting contain an entry indicating that the challenged action was taken due to "the adverse financial status being faced by the district," the record does not otherwise reflect that the decision was one "implicating the budgetary priorities of the city and the services the city provides to its constituents."  On the contrary, the minutes indicate that the Board went into executive session for the specific purpose of "discuss[ing] the employment of public employees."  Moreover, the circumstances of the one-hour executive session—which included short visits by some of the individuals under review—suggest that the Board was making personalized assessments of individual employees, not engaging in an impersonal budgetary analysis of various positions.  In fact, the minutes explicitly indicate that the recommended resignations, changes in status, and appointments/reappointments constituted "personnel actions." *See Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988) ("[E]mployment decisions generally are administrative . . . .").

Bogan's and Roderick's motion to dismiss, which was based on an assertion of legislative immunity. On appeal, the First Circuit affirmed, holding that the challenged conduct was administrative, not legislative. *See Scott-Harris v. City of Fall River*, 134 F.3d 427 (1st 1997).

The Supreme Court reversed, holding that "local legislators are . . . absolutely immune from suit under § 1983 for their legislative activities." *Bogan*, 523 U.S. at 49. The Court made clear that the determination of whether an activity is "legislative" must be made without regard to the legislators' subjective intent. *See id.* at 54 ("[T]he [First Circuit] erroneously relied on [the officials'] subjective intent in resolving the logically prior question of whether their acts were legislative."); *see also Tenney*, 341 U.S. at 377 ("The claim of an unworthy purpose does not destroy the privilege."). In other words, "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54. The proper inquiry, therefore, was "whether, stripped of all considerations of intent and motive, [the] actions were legislative." *Id.* at 55.

Applying those standards to the facts before it, the Supreme Court ruled that Bogan and Roderick were indeed entitled to legislative immunity: "Roderick's acts of voting for an ordinance were, in form, quintessentially legislative. . . . Bogan's introduction of a budget and signing into law an ordinance also were formally legislative, even though he was an executive official. . . . Bogan's actions were legislative because they were integral steps in the legislative process." *Id.* (citations omitted). The Court then looked beyond Roderick's and Bogan's "formal actions" to consider whether the ordinance at issue was legislative "in substance":

> We need not determine whether the formally legislative character of [Roderick's and Bogan's] actions is alone sufficient to entitle [them] to legislative immunity, because here the ordinance, in substance, *bore all the hallmarks of traditional legislation*. The ordinance

protecting the security of test materials while they are in school." (Emphasis in original.) Specifically with respect to the practice objected to by Canary and Welton, Trent wrote as follows:

> Although [Rule 3301-12-06] contains no specific provision limiting the preview of test materials by teachers, both Section 3319.151 of the Revised Code and this rule clearly prohibit the use of materials for the purpose of improving a student's score. Encouraging teachers to review the actual tests for the purpose of "improving test-taking techniques[]" . . . is an activity that, in certain high stakes situations, might result in someone's using the information to improve students' scores.
>
> We expect Portsmouth City Schools to discontinue immediately the practice of encouraging or allowing teachers to preview the tests currently being administered by the district (or commercially-prepared alternative forms of such tests) for the purpose of "improving test-taking techniques."

Trent ultimately concluded, however, that "there is no concrete evidence that any one [sic] used the test materials to reveal any specific test question to a student or to help any student cheat . . . ."

In a separate but related dispute, another employee of the School District, Michael Osborne, sued the Board in 1993 "relat[ing] to a forced vacation following an allegation that [he] had disseminated actual achievement test questions to the faculty at Wilson . . . ." (Michael Osborne, a teacher at the Wilson Elementary School, is not to be confused with H. Garry Osborn, the Superintendent of the School District.) William K. Shaw, Jr. served as Michael Osborne's attorney. During the course of Shaw's representation, he requested and received from the Ohio Department of Education an unredacted copy of Canary's letter to Trent. Armed with Canary's letter, Shaw met with Osborn and Ross in June of 1993. During that meeting, Shaw complained that his client,

Michael Osborne, was "being blamed and disciplined for allegedly creating a teaching controversy" while Canary, who Shaw characterized as "the driving force behind the State's investigation," had not been "punished in any form." According to Shaw, Ross responded to the complaint by stating that he and Osborn "would take care of Canary." Shaw also contends that "Osborn nodded as if in agreement . . . ."

Shortly after Shaw's meeting with Osborn and Ross, Osborn asked Canary about the substance of his letter to Trent. According to Canary, Osborn "angrily confronted" him and asked "[W]hat is this horse[—] letter[?]" Osborn testified during his deposition that, after learning from Shaw that Canary had written the letter to Trent, he shared that information with members of the Board: "I would assume that I would have had a discussion with them about it or sent them a copy [of the letter]. . . . You know, I can't recall any specific conversation, but I'm assuming that I would have discussed it with them, and shared a copy with them and counsel." A copy of the letter was also distributed by Osborn to other administrators. In July of 1993, Canary was transferred from McKinley to Portsmouth East.

On March 10, 1994, the Board held one of its regular meetings. Apel, Fuller, Hickman, Stevens, and Sturgill were all in attendance. The minutes reflect that, after approximately thirty-five minutes of discussing several routine matters, the Board went into executive session "to discuss the employment of public employees." In addition to the Board, other individuals were allowed to attend the executive session, including Osborn and Ross. The closed meeting lasted from 6:40 p.m. until 7:43 p.m. During that time, various "outsiders" were permitted into the executive session. For example, Shaw and Michael Osborne entered at 6:50 p.m. and exited at 7:13 p.m., and Welton attended from 7:22 p.m. until 7:41 p.m. Canary was not present for any part of either the regular meeting or the executive session.

in a legislative manner when they voted to not renew Canary's contract. In response, Canary contends that the defendants' action "was simply an administrative employment decision." Because we agree with Canary's position as to the factual nature of the inquiry and whether the contested action was legislative in nature in this case, we need not address the question of whether a school board can ever be shielded by legislative immunity.

The disposition of the present case requires a close examination of *Bogan*. Janet Scott-Harris, the plaintiff in that case, was the Administrator of the Fall River (Massachusetts) Department of Health and Human Services (DHHS). During her tenure, she received a complaint that one of her temporary employees had made several racial and ethnic slurs about the employee's colleagues. Scott-Harris responded by preparing termination charges against the employee. The employee, however, was able to forestall termination by using her political connections with the Fall River City Council to obtain a hearing on the matter. As a result of the hearing, the employee agreed to be suspended without pay for sixty days. Daniel Bogan, the mayor of Fall River, eventually reduced the length of the suspension.

While the charges against the employee were pending, Bogan had prepared his annual city budget proposal. Anticipating a reduction in revenue, Bogan proposed freezing municipal employee salaries and eliminating 135 jobs. Included in his proposal was the elimination of the DHHS, of which Scott-Harris was the sole employee. The City Council Ordinance Committee, chaired by Marilyn Roderick, approved an ordinance eliminating the DHHS. After the city council adopted the ordinance, Bogan signed it into law.

Scott-Harris thereafter filed a § 1983 action against Fall River, Bogan, Roderick, and others, alleging that "the elimination of her position was motivated by racial animus and a desire to retaliate against her for exercising her First Amendment rights in filing the complaint against [the employee]." *Bogan*, 523 U.S. at 47. The district court denied

Constitution, *see* U.S. CONST. art. I, § 6, has been summarized as follows:

> In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense.

*Tenney*, 341 U.S. at 373 (citation and internal quotation marks omitted). It is the defendants' burden to establish the existence of absolute legislative immunity. *See Kamplain v. Curry County Bd. of Comm'rs*, 159 F.3d 1248, 1251 (10th Cir. 1998).

Recently, the Supreme Court extended this "venerable tradition" to *local* legislators, making them "absolutely immune from suit under § 1983 for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998). It reasoned as follows:

> The rationales for according absolute immunity to federal, state, and regional legislators apply with equal force to local legislators. Regardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability. Furthermore, the time and energy required to defend against a lawsuit are of particular concern at the local level, where the part-time citizen-legislator remains commonplace. And the threat of liability may significantly deter service in local government where prestige and pecuniary rewards may pale in comparison to the threat of civil liability.

*Id.* at 52 (citations omitted).

As previously noted, the defendants argued in support of their summary judgment motion that the members of the Board are entitled to such immunity because they were acting

The results of the Board's closed meeting are set forth in its minutes under the title "personnel actions," and are further divided into "resignations," "change[s] in status," and "appointment[s]/reappointment[s]." As for the first of these categories, the minutes reflect that the Board accepted the resignations of a teacher/tutor and of a custodian. The third category lists eight principals and assistant principals, including Kinker, who were appointed or reappointed, along with their respective contract start dates.

Five individuals are listed under the "change[s] in status" category. The minutes indicate that, after the Board changed the title of one of its substitute teachers, it voted to not renew the contracts of four certified administrators—Canary, Kathleen Moore, Michael Osborne, and Welton. Each name is listed separately, followed by their title as of the date of the meeting, a summary of the expiring contract, and the position to which they were newly appointed. For Canary, Michael Osborne, and Welton, that new position was a demotion to "Teacher, Continuing Contract." The following explanation is provided in the minutes for each of these "change[s] in status":

> This action reflects the adverse financial status being faced by the district. As a result of the financial situation, it will be necessary to carefully analyze the cost efficiency of other district positions and possibly eliminate some positions which are important; but not critical to the operation of the district. The possibility of such action being taken in the future was communicated to all administrators in March of 1991.

All of these decisions were made upon Osborn's recommendation, and were unanimously approved by the Board. During the remainder of the meeting, the Board discussed various financial reports and other miscellaneous matters. By letter dated March 11, 1994, Osborn informed Canary of the Board's decision, and provided the following explanation:

The action was taken as a reaction to the adverse financial status being faced by the district. Difficult situations often result in the need to take unpleasant actions. We are sad for the discomfort and displeasure the action may cause you. The best is wished for your tenure as a district teacher.

Although not entirely clear from the record, the Board apparently created two new "student facilitator" positions for the School District sometime after March of 1994. Osborn testified during his deposition that a student facilitator, among other things, "helps with discipline, proficiency, testing, guidance of young people, [and] counseling." At least one of the student facilitators was allocated to Portsmouth East, where Joe Knapp served as the Principal. During the summer of 1994, Canary, at the urging of Knapp, applied for that position. He was not appointed. At the end of the summer, Canary was informed that he would be assigned to teach at McKinley for the 1994-1995 school year. It was then that he learned that Jim Smith, another employee within the School District, had been chosen to be the new student facilitator at Portsmouth East.

## B.   Procedural history

Canary filed suit against Apel, Fuller, Hickman, Osborn, Stevens, Sturgill, and the Board. He sued the members of the Board in their individual and official capacities. In his complaint, Canary alleged that the defendants "infringed upon [his] right to speak out about matters of public concern by retaliating against him and demoting him because he refused to engage in the cheating scheme . . . and because he reported the activity to the State of Ohio."

The defendants filed a motion for summary judgment on May 15, 1998. Among other things, they argued that Apel, Fuller, Hickman, Stevens, and Sturgill were not liable in their individual capacities because they were entitled to absolute legislative immunity as established by *Bogan v. Scott-Harris*, 523 U.S. 44 (1998). The district court, by order dated September 30, 1998, denied the defendants' motion. In its

order, the district court concluded that the members of the Board were not entitled to absolute legislative immunity because "in not renewing particular employees' contracts while renewing others, the Board was making individual employment decisions."

In this appeal, the defendants do not contest the other rulings contained in the district court's order. Rather, they take issue with the district court's interpretation of *Bogan* and argue that *Bogan* is indistinguishable from the present case.

## II.   ANALYSIS

### A.   Standard of review

We review de novo a district court's decision to grant or deny summary judgment. *See Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The judge is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

### B.   The district court did not err when it held that the defendants were not entitled to absolute legislative immunity

"Freedom of speech and action in the legislature was taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation." *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951). The rationale supporting such absolute legislative immunity, which was written into our