RENDERED: NOVEMBER 17, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1536-MR

LAURA MCCARTY AS
THE ADMINISTRATRIX
OF THE ESTATE OF
LEAH CARTER                                                    APPELLANT


v.                 APPEAL FROM MONROE CIRCUIT COURT
                   HONORABLE DAVID L. WILLIAMS, JUDGE
                        ACTION NO. 19-CI-00080


JAMES WILLETT AND SCOTT
WILLETT AS CO-EXECUTORS
OF THE ESTATE OF TOM
ROBERT WILLETT, III; RICKY
BARTLEY, ROGER DECKARD,
ALONZO FORD, KAREN GORDON,
MITCHELL PAGE, JAIME VEACH,
RICKY GRAVES, AND MARK
WILLIAMS, INDIVIDUALLY AND
IN THEIR OFFICIAL CAPACITIES
AS MONROE COUNTY MAGISTRATES;
LARRY GRAVES, INDIVIDUALLY AND
IN HIS OFFICIAL CAPACITY AS
SUPERVISOR OF THE COUNTY
ROADS OF MONROE COUNTY;
MONROE COUNTY FISCAL COURT;
ARNOLD CONSULTING SERVICES, INC.;
AND QK4, INC.                                                  APPELLEES

<u>OPINION</u>
<u>AFFIRMING IN PART AND</u>
<u>REVERSING AND REMANDING IN PART</u>

\*\* \*\* \*\* \*\* \*\*

BEFORE:  CETRULO, KAREM, AND McNEILL, JUDGES.

KAREM, JUDGE:  Laura McCarty, as the Administratrix of the Estate of Leah Carter ("the Estate"), appeals from the Monroe Circuit Court's findings of fact, conclusions of law, and order granting summary judgment.  McCarty's daughter, Leah Carter, drowned after flood waters swept her car from a bridge in Monroe County.  The Estate brought a wrongful death suit against multiple defendants, including the Monroe County Judge Executive, several members of the Monroe County Fiscal Court, the Monroe County road supervisor, and the two engineering companies who designed the bridge.  The trial court held that the Monroe County defendants were entitled to legislative and qualified official immunity.  It further held that the engineering firms were protected by the county's sovereign immunity and by qualified official immunity, and that the removal of a portion of the guardrail on the bridge was a superseding act that absolved them of any potential liability.  Upon careful review, we affirm in part, we reverse in part the grant of summary judgment, and remand for further proceedings.

## BACKGROUND FACTS

In 2012, Monroe County received a $500,000 HUD[1] grant to repair and improve county roads that had been damaged in flooding. The county decided to use most of the funds to replace the Lyons Road ford over the East Fork of the Barren River. The ford, which consisted of several pipes covered with gravel, flooded when it rained and had been deemed unsafe. The Monroe County Fiscal Court held a special meeting to consider three different consulting firms to oversee the construction of the bridge; they chose Arnold Consulting Engineering Services, Inc. ("ACES"). The fiscal court thereafter entered into a contract with ACES to manage the project. ACES obtained the necessary permits from the Army Corps of Engineers and the Kentucky Division of Water, performed the surveying and the hydrologic modeling, and reviewed the bids submitted for construction. ACES designed the road approaches to the bridge and sub-contracted with QK4, Inc. ("QK4") to design the actual bridge structure. Do-All Construction was hired to build the bridge.

Kent Gilley, the engineer who designed and coordinated the bridge project for ACES, testified in his deposition that the height of the bridge was limited by the county's budget. He explained that constructing a bridge high enough to withstand a 100-year flood event would have cost $2 million to $3

---

[1] (Department of) Housing and Urban Development.

million and that even a bridge costing $1 million would have been overtopped with water. ACES provided the fiscal court with several less expensive options. The County Judge Executive at the time, Tommy Willett, selected a design for a two-lane prestressed box beam bridge that could possibly withstand a two or five-year flood event.

Gilley determined where the guardrails would be placed on the approaches to the bridge. He explained that the guardrail on the right side was extended to prevent cars from exiting outside of the curve where the stream widened on the downstream end of the bridge. He testified that this was its function during normal conditions and that the guardrails were not intended or designed to keep a motor vehicle on the bridge during flood conditions. He explained that the bridge was not designed to be driven over at all during flood events and that this was why advanced warning signs, advising motorists not to cross in flood conditions, were placed on both ends of the approaches to the bridge.

The plans for the bridge provided for three permanent signs to be installed on the approach to the bridge: "Flood Area Ahead," placed at 750 feet before the bridge; "Impassable During High Water" at 550 feet before the bridge; and "Do Not Enter When Flooded" at 200 feet before the bridge.

Jeff Arnold, the president of ACES, which he founded in 2006, testified that the Kentucky Transportation Cabinet had been one of his company's

bigger clients until three or four years before; more recently, his clients included the developer of the Dollar General Stores and Realty Link, a company located in Greenwell, South Carolina, which performs commercial, retail, and residential work.

Like Gilley, Arnold testified that the Lyons Road bridge was not designed to be driven over by motorists during flood conditions and that the guardrails on the bridge were not designed to keep a motor vehicle on the bridge during flood conditions.

Roger Wade, the chief structural engineer at QK4 who performed the structural design work on the bridge itself, was asked the following question in his deposition: "Are guardrails designed and installed on bridges to keep motorists on the road when the motorist may attempt to pass when water is over the bridge? Is that the intent or purpose of the guardrails?" He responded, "What I would say is the intent is to protect the motorists from when they impact, to keep them on the bridge. I don't know how – if water is included in that analysis. I've never done one where water was included in the analysis of the impact." He was then asked, "If water were over the guardrails, would that keep a motorist from passing – or from washing off the bridge?" He replied, "It would not."

Evidence was elicited that modifications were made to the design of the bridge during construction that were not approved by ACES. Changes were

made to the vertical grade of the bridge and the materials used on the bridge; for example, ACES's design called for sloped rock abutments but the bridge was built using sloped concrete abutments. ACES did not have adequate funding to perform periodic inspections and consequently the county road supervisor, who was not an engineer, supervised the construction. Neither ACES nor QK4 had any involvement with the bridge after it was completed in 2014.

Soon after the completion of the bridge, the county began receiving complaints that debris and trash were collecting in the guardrail and preventing water from flowing through. According to Gilley, he had anticipated this problem and feared that debris would get trapped by the guardrail and damage it. The county road supervisor had to employ his road crew with backhoes and other heavy equipment to remove and haul off the debris. This occurred almost every time it rained and resulted in the road being closed on multiple occasions.

At some point between 2015 and 2017, Willett, the County Judge Executive at that time, decided that forty feet of guardrail would be removed on the east approach to the bridge to allow the debris to flow through more freely. Willett claimed he spoke with Magistrate Alonzo Ford about removing the guardrail, although Ford did not recall the conversation. Willett did not consult ACES or QK4, the Transportation Cabinet, or the Army Corps of Engineers regarding the removal of the guardrail. The road supervisor and his crew shortened the guardrail

by approximately forty feet. Gilley testified that the county officials did not need his approval to remove that portion of the guardrail, but, if they had consulted him, he would have told them not to do so.

On December 31, 2018, Leah Carter, who was nineteen years of age, left her parents' home at approximately 6:30 p.m. to have New Year's Eve dinner with her boyfriend's family. The accident report states that it had rained that day and the Lyons Road bridge was flooded. As she drove across the bridge, her car was carried off the bridge by flood waters. She was able to place distress calls to 911 and to her mother, but first responders were unable to find her or her vehicle until five days later. Her cause of death was drowning.

At the time Carter approached the bridge, the sign placed 200 feet before the bridge reading "Do Not Enter When Flooded" had been removed. It is not known who removed the sign or exactly when the removal occurred. The two remaining signs – "Flood Area Ahead" and "Impassable During High Water" – were affixed to one pole rather than separate poles.

The Estate filed a wrongful death action alleging negligence relating to the design, construction, and maintenance of the Lyons Road bridge and the adequacy of the warning signs. The defendants included the Monroe County Fiscal Court; the Monroe County Judge Executive Tommy Willett in his individual and official capacity (Willett passed away during the proceedings and James

-7-

Willett and Scott Willett as the co-executors of his estate were substituted as parties); eight Monroe County Fiscal Court representatives, in their individual and official capacities; the Monroe County Road Supervisor, Larry Graves; Do-All Construction, Inc., QK4; and ACES. During the course of discovery, the Estate settled its claims against Do-All Construction and an agreed order was entered dismissing it as a defendant. The Estate named two additional defendants in its first amended complaint: Norm Fertig and Michael Vickers, both individually and in their official capacities as inspectors for QK4, as retained by the Kentucky Department of Transportation.

On November 29, 2022, the trial court granted summary judgment to all the remaining defendants with the exception of Fertig and Vickers. It designated its opinion and order as final and appealable, there being no just cause for delay, in accordance with Kentucky Rules of Civil Procedure ("CR") 54.02. The opinion held that the Monroe Fiscal Court was entitled to sovereign immunity, and the County Judge Executive, the Fiscal Court members and the road supervisor were entitled to sovereign immunity in their official capacities and qualified official immunity in their individual capacities. It further held that the County Judge Executive and Magistrates were entitled to absolute legislative immunity. As to ACES and QK4, the trial court held that they were cloaked with the county's

sovereign immunity and that the removal of the guardrail constituted a superseding cause that absolved them of any liability.

This appeal by the Estate followed.[2]

## STANDARD OF REVIEW

In reviewing a grant of summary judgment, our inquiry focuses on "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996); CR 56.03. The trial court is required to view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). On the other hand, "a party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Id.* at 482. "An appellate court need not defer to the trial court's decision on summary judgment and will review the issue *de novo* because only legal questions and no factual findings are involved." *Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 705 (Ky. App. 2004).

---

[2] The Estate filed a notice of appeal which included Fertig and Vickers as named appellees. It subsequently filed an amended notice of appeal deleting these names, presumably to reflect the fact that the trial court's grant of summary judgment did not apply to these defendants.

## ANALYSIS

As a preliminary matter, the Estate does not challenge the trial court's ruling that the Monroe County Fiscal Court, Judge Executive, Magistrates, and road supervisor are entitled to sovereign immunity in their official capacities. The trial court's judgment is affirmed in this respect.

**I. The trial court erred as a matter of law in granting summary judgment to the Judge Executive and Magistrates on the basis of legislative immunity**

The trial court ruled that the Monroe County Judge Executive and Magistrates are entitled to absolute legislative immunity, in their official and individual capacities. The Estate argues that (1) these appellees waived the defense of absolute legislative immunity by failing to plead it as an affirmative defense in a timely manner; (2) absolute legislative immunity does not apply to county officials; and (3) even if legislative immunity does apply, the actions of these appellees were not legislative in character.

"As a general rule, a party's failure to timely assert an affirmative defense waives that defense . . . *unless* the circuit court allowed it to be presented later." *American Founders Bank, Inc. v. Moden Investments, LLC*, 432 S.W.3d 715, 722 (Ky. App. 2014) (citing *Bowling v. Kentucky Dep't of Corrections*, 301 S.W.3d 478, 485 (Ky. 2009)); CR 8.03).

The Estate filed its complaint on September 27, 2019, and its first amended complaint on February 21, 2020. The Monroe County appellees did not

-10-

raise the affirmative defensive of legislative immunity in their answers. In the memorandum supporting their motion for summary judgment, filed on September 2, 2021, the Monroe County appellees argued for the first time that they were entitled to legislative immunity. In its sur-reply filed on October 20, 2021, the Estate disputed the availability of legislative immunity. The Estate filed a motion for leave to file its second amended complaint on October 15, 2021. The Monroe County appellees filed an answer to the second amended complaint on February 28, 2022, asserting the affirmative defense of legislative immunity. The trial court's order granting summary judgment was entered on November 29, 2022.

Upon careful consideration, we conclude that the Monroe County appellees did not waive the affirmative defense of legislative immunity. Although the defense was only asserted for the first time in their motion for summary judgment, the Estate was given an adequate opportunity to respond to the assertion of the defense and the trial court allowed it to do so.

Legislative immunity applies to members of Congress and to members of the Kentucky General Assembly, under the terms of the United States Constitution and the Kentucky Constitution.

> Legislative immunity is derived from the Speech or Debate clause found in the U.S. Constitution, Article I, Section 6. *See also Tenney v. Brandhove*, 341 U.S. 367, 372-73, 71 S. Ct. 783, 786, 95 L. Ed. 1019 (1951). The U.S. Supreme Court has determined that the clause immunizes congressmen from suits for either prospective

relief or damages. *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502-503, 95 S. Ct. 1813, 1821, 44 L. Ed. 2d 324 (1975). The purpose of this immunity is to insure that the legislative function may be performed independently without fear of outside interference. In other words, to preserve legislative independence, "legislators engaged 'in the sphere of legitimate legislative activity' should be protected not only from the consequences of litigation's results but also from the burden of defending themselves." *Dombrowski v. Eastland*, 387 U.S. 82, 85, 87 S. Ct. 1425, 1428, 18 L. Ed. 2d 577 (1967) (quoting *Tenney*, 341 U.S. at 376, 71 S. Ct. at 788).

Similarly, Section 43 of the Kentucky Constitution explicitly protects "any speech or debate" of members of the General Assembly that is made within the confines of the Senate or House of Representatives. Kentucky Revised Statutes (KRS) 83A.060(15), formerly KRS 84.050(5), further states: "For anything said in debate, legislative body members shall be entitled to the same immunities and protections allowed to members of the general assembly." Thus, our General Assembly intended to grant an absolute privilege to "legislative body members" while performing the functions of the office.

*D.F. Bailey, Inc. v. GRW Engineers, Inc.*, 350 S.W.3d 818, 821 (Ky. App. 2011).

Legislative immunity has been extended to city officials by KRS 83A.060(15), which states: "For anything said in debate, [city] legislative body members shall be entitled to the same immunities and protections allowed to members of the General Assembly."

There is no comparable statute extending legislative immunity to county officials. The Monroe County appellees rely on *Bogan v. Scott-Harris*, 523

U.S. 44, 118 S. Ct. 966, 140 L. Ed. 2d 79 (1998), which holds that "[l]ocal legislators are entitled to absolute immunity from [42 United States Code ("U.S.C.")] § 1983 liability for their legislative activities." 523 U.S. at 54, 118 S. Ct. at 972. The *Bogan* Court reasoned that, "[r]egardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability." *Id.* at 52, 118 S. Ct. at 971. But *Bogan*, by its own terms, applies only to federal § 1983 actions, not to Kentucky tort claims.

Whether county officials are protected by legislative immunity or not, the defense is not available to the Monroe County Judge Executive and Magistrates because their actions were not legislative in nature. "[L]egislative immunity applies if an act is both legislative in form and legislative in substance." *4th Leaf, LLC v. City of Grayson*, 425 F. Supp. 3d 810, 823 (E.D. Ky. 2019). "Legislative immunity attaches [only to] actions taken 'in the sphere of legitimate legislative activity.'" *Bogan*, 523 U.S at 54, 118 S. Ct at 972. Recently, the Kentucky Supreme Court cautioned that legislative immunity is not unlimited:

> Broad though the ambit of protection for the legislative sphere has become, it does not cover everything lawmakers do. Legislative immunity does not apply to activities that are casually or incidentally related to legislative affairs but not part of the legislative process itself. For instance, even under the broad scope of the federal speech or debate clause, legislative immunity does not protect the political activities of legislators, nor

-13-

does it protect legislators engaged in criminal activity, even if the criminal activity is committed in furtherance of legislative activity.

*Stivers v. Beshear*, 659 S.W.3d 313, 324 (Ky. 2022) (internal quotation marks and citations omitted).

The Fiscal Court serves as the legislative body for Monroe County, as established pursuant to Kentucky Constitution, Section 144 and KRS 67.040 *et seq.* but that does not mean that every action or decision its officials take is legislative in character. *See Lincoln Trail Grain Growers Association, Inc. v. Meade County Fiscal Court*, 632 S.W.3d 766, 768 (Ky. App. 2021). In other words, the Monroe County Judge Executive and Magistrates are not entitled to legislative immunity simply by virtue of being elected officials.

In the federal context, "[i]t is the defendants' burden to establish the existence of absolute legislative immunity." *Canary v. Osborn*, 211 F.3d 324, 328 (6th Cir. 2000). The Estate's claims against the County Judge Executive and Magistrates concern their alleged failure to get the requisite approval for modifications of the bridge, to maintain required signage at the bridge, and their decision to remove a section of the guardrail. These actions or omissions do not exhibit "all the hallmarks of traditional legislation." *Grayson*, 425 F. Supp. 3d at 823. There is no evidence that the Fiscal Court as a body ever discussed any of these actions or held a formal vote on them. Willett's decision to remove a portion

of the guardrail was apparently made after an informal, personal conversation with one of the Magistrates, who did not remember the interchange.

The trial court held that the appellees' actions were inherently legislative based on KRS 67.080, which gives the fiscal court the power, among other things, to "cause the construction, operation, and maintenance of all county buildings and other structures, grounds, roads and other property[.]" KRS 67.080(2)(b). But these duties are not purely legislative; they are executive and administrative. The fiscal court exercises legislative and ministerial powers as well as powers quasi-judicial in their nature. *Shelton v. Smith*, 284 Ky. 236, 144 S.W.2d 500, 501 (1940). KRS 67.080 does not bestow blanket immunity on the appellees for every action taken in connection with the construction, operation, or maintenance of the bridge.

Based on the evidence before us, the County Judge Executive and Magistrates' alleged failure to get requisite approval for the modifications of the bridge, failing to maintain signage at the bridge, and removing a section of the guardrail do not qualify as legislative acts and, consequently, the trial court erred as a matter of law in holding that these acts were protected by legislative immunity.

**II. The Monroe County appellees were not entitled to qualified official immunity because the maintenance of the signs and guardrail was a ministerial duty**

The Estate argues that the trial court erred in ruling that the Monroe County appellees were entitled to qualified official immunity in their individual capacities from the negligence claims stemming from the removal of a portion of the guardrail on the bridge and failure to maintain the signage leading up to the bridge.

Qualified official immunity applies to shield only "the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment . . . ; (2) in good faith; and (3) within the scope of the employee's authority[.]" *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citations omitted). "[A]t their core, discretionary acts are those involving quasi-judicial or policy-making decisions." *Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014). Immunity is provided for discretionary acts because the "courts should not be called upon to pass judgment on policy decisions made by members of coordinate branches of government in the context of tort actions, because such actions furnish an inadequate crucible for testing the merits of social, political or economic policy." *Yanero*, 65 S.W.3d at 519.

By contrast, immunity from tort liability is not afforded to government officials "for the negligent performance of a ministerial act." *Patton v. Bickford*, 529 S.W.3d 717, 724 (Ky. 2016), *as modified on denial of rehearing* (Aug. 24, 2017). "[A] duty is ministerial 'when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.'" *Id.* (citation omitted). "[A] government official performing a ministerial duty does so without particular concern for his own judgment; . . . the act is ministerial 'if the employee has no choice but to do the act.'" *Id.* at 724 (citations omitted). "Of course, whether a ministerial act was performed properly, i.e., non-negligently, is a separate question from whether the act is ministerial, and is usually reserved for a jury." *Marson*, 438 S.W.3d at 297.

The trial court ruled that the removal of a portion of the guardrail was a "judgment call" made in response to numerous complaints about the accumulation of debris and trash and concluded on that basis that it was a discretionary act. The trial court further held that the record was clear that advanced warning signs were present on the date of the accident to warn motorists not to cross the bridge during heavy rains and, for this reason, the Estate's claim of inadequate warning failed as a matter of law.

-17-

Under our case law, the removal of the portion of the guardrail and the failure to replace the missing warning sign were ministerial acts or omissions for which the Monroe County defendants are not afforded qualified official immunity.

In *Estate of Clark ex rel. Mitchell v. Daviess County*, 105 S.W.3d 841, 846 (Ky. App. 2003), the Court held that the alleged failure of county employees to replace a missing highway warning sign was ministerial in nature. If a case "involves the maintenance or repair of existing sections of roadway, rather than a decision to erect signs or guardrails on same, such action or inaction may be considered ministerial." *Hammers v. Plunk*, 374 S.W.3d 324, 330 n.3 (Ky. App. 2011). The maintenance of county roads and bridges is ministerial rather than discretionary. *Shearer v. Hall*, 399 S.W.2d 701 (Ky. 1965). The Monroe County defendants had a ministerial duty to maintain the guardrail once it was put in place and, consequently, they are not entitled to qualified official immunity for claims relating to its partial removal.

Similarly, they had a ministerial duty to maintain the warning signs once those signs were put in place. The trial court's holding that the claim of inadequate warning fails as a matter of law because the advanced warning signs were present on the date of the accident does not accurately reflect the evidence in the record. The "Do Not Enter When Flooded" sign was missing on the date of the accident and the other two signs were affixed to one pole, rather than to separate

-18-

poles placed at different distances from the bridge. The Estate claims that this arrangement was in violation of the Manual on Uniform Traffic Control Devices for Streets and Highways, the requirements of the design plans, and the standard of care for the industry. This argument is supported by the opinions of the Estate's expert witnesses. Therefore, the trial court erred in dismissing the claim relating to the adequacy of the warning signs as a matter of law because genuine issues of material fact remain about the number and placement of the signs.

**III. Private contractors are not entitled to sovereign or qualified immunity simply because they are performing work for a county and QK4 and ACES are not entitled to sovereign immunity under the facts of this case**

The Estate challenges the trial court's ruling that the two private contractors, ACES and QK4, were entitled to the same immunity as the county itself. KRS 322.360(1) provides that "Neither the state nor any of its political subdivisions shall engage in the construction of any public work involving engineering, unless the plans, specifications, and estimates have been prepared and the construction executed under the direct supervision of a professional engineer or a licensed architect." Because Monroe County does not have its own civil or structural engineer, due to the scarcity of engineering professionals in rural counties, it engaged ACES and its subcontractor QK4 to develop the plans, specifications and estimates for the bridge design. The trial court reasoned that, as

the county's appointees, ACES and QK4 were entitled to the same sovereign immunity as the county itself.

In determining whether an entity is an arm, agent, or alter ego of a county in order to share in its immunity, we consider the origins of the entity and the nature of the function it carries out. *Comair v. Lexington-Fayette Urban County Airport Corp.*, 295 S.W.3d 91, 99 (Ky. 2009). For example, in *Autry v. Western Kentucky University*, SLF Inc., which owned a dormitory at Western Kentucky University ("WKU"), was held to be an alter ego of WKU because it existed only to serve the university and consequently was entitled to share its immunity. 219 S.W.3d 713 (Ky. 2007). The Court explained, "WKU is a governmental agency fulfilling the public purpose of higher education by providing residence halls to its students which it manages and controls. It uses SLF as an agent to own property for WKU's purposes. This is all that SLF does. Thus, while SLF is an incorporated entity, it exists only to serve WKU, and derives its immunity status through WKU." *Id*. at 719.

By contrast, Monroe County did not create ACES or QK4 as a governmental agency, nor did it designate either of them as the county's agent or alter ego. *See Shadrick v. Hopkins County, Ky.*, 805 F.3d 724, 746 (6th Cir. 2015). These entities are private, for-profit companies that do not exist only to serve Monroe County. The president of ACES testified that the company has numerous

clients including commercial companies like Dollar General and Realty Link. The status of ACES and QK4 is analogous to that of Southern Health Partners, Inc. ("SHP"), a for-profit company providing medical services to jails and detention centers, including the Hardin County Detention Center ("HCDC"). After an inmate brought a medical negligence claim against HCDC, this Court held in an unpublished opinion that SHP and its nurses were not entitled to qualified official immunity because SHP is a private corporation that operates in twelve different states and does not exist solely to serve the HCDC and is not its alter ego. *Sietsema v. Adams*, No. 2013-CA-001159-MR, 2015 WL 4776304, at \*7 (Ky. App. Aug. 14, 2015), *reversed on other grounds by Adams v. Sietsema*, 533 S.W.3d 172 (Ky. 2017). The Court's analysis of SHP's status, although not of precedential value, applies equally to ACES and QK4:

> SHP was not created by the state of Kentucky or any of its agencies, but is a private, for-profit corporation. Simply because it provides services to a state agent does not automatically entitle it to official immunity. In fact, Kentucky and Federal case law find that an independent contractor who performs services for the government is liable for his own negligence and is "responsible just as he would be on private work." *Taylor v. Westerfield*, 233 Ky. 619, 26 S.W.2d 557, 561 (1930). *See also Richardson v. McKnight*, 521 U.S. 399, 117 S. Ct. 2100, 138 L. Ed. 2d 540 (1997) (prison guards employed by a private company are not entitled to immunity); *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012) (a psychiatrist employed by an independent, non-profit organization who worked part-time for a county prison is not entitled to qualified immunity); *Harrison v.*

> *Ash*, 539 F.3d 510 (6th Cir. 2008) (nurses employed by a private medical provider to provide medical services in a jail are not entitled to qualified official immunity).

*Sietsema*, 2015 WL 4776304, at *7. The fact that the county is required by statute to employ an engineer or architect in the construction of public works does not extend governmental immunity to that individual or entity; under KRS 441.045, detention facilities are required to provide medical care for inmates but entities like SHF which provide these services are not cloaked with governmental immunity. ACES and QK4 are not entitled to governmental immunity and consequently their officials are not entitled to qualified official immunity.

ACES argues that it was entitled to summary judgment on other than immunity grounds. It contends that because it designed the bridge as a reasonable engineer would under similar circumstances, its design does not violate the applicable standard of care, and that the standard of care may be relaxed on projects such as this one where funding is limited. "[A]n expert witness is required to establish the standard of care in professional negligence cases in Kentucky, unless the standard is within the general or common knowledge of laypersons." *Boland-Maloney Lumber Co., Inc. v. Burnett*, 302 S.W.3d 680, 686 (Ky. App. 2009). The design of a bridge and its approaches is certainly not within the common knowledge of laypersons. These factual determinations preclude the grant of summary judgment to ACES.

QK4 argues that, in addition to being entitled to the same immunity as the county, it was further cloaked with immunity when the county approved its structural design. QK4 contends that when the Monroe County Fiscal Court approved the bridge design, the fiscal court immunized QK4 from any personal injury claims. It contends that QK4 could not make the legislative decision for the fiscal court as to which design to implement based on the limited budget available and that QK4's design achieved the objectives of supporting traffic and staying standing during a flood. QK4 argues that there is no evidence of any kind that its design did not meet Kentucky engineering standards and perform as Monroe County had intended.

QK4's argument elides immunity derived from a governmental body with common law liability for negligence. Its contention that consulting engineers are protected by "derivative sovereign immunity" based on the "government contractor defense" is not in our case law. As we have already determined, QK4 is not entitled to governmental immunity derived from the county. The case upon which QK4 relies, *Rigsby v. Brighton Engineering Company*, 464 S.W.2d 279, 281 (Ky. 1970), contains a straightforward negligence analysis that does not extend sovereign or governmental immunity to the contractor. In designing a bridge for the Kentucky Department of Highways, Brighton Engineering was required to comply with the Department's binding criteria that guardrails would not be

installed around the bridge piers. A motorist and his family were killed when they struck one of the piers. The Court held that Brighton was not liable for the absence of guardrails, stating:

> The Commonwealth, Department of Highways has a staff of engineers with wide experience and expertise in the design and construction of highways. It had adopted criteria which were binding upon Brighton. It appears a recommendation that guardrails be installed at this point would have been futile as well as contrary to the directions of the Commonwealth. Under these circumstances it cannot be said that Brighton's failure to recommend guardrails was negligent.

*Rigsby*, 464 S.W.2d at 281.

In *McCabe Powers Body Company v. Sharp*, 594 S.W.2d 592 (Ky. 1980), another case cited by QK4, a worker was injured after he fell out of the open side of a cherry picker. He filed a personal injury suit against the manufacturer, McCabe, alleging that the bucket was unreasonably dangerous.

> McCabe had constructed this aerial boom in exact accordance with the specifications of the Kentucky Division of Purchases contained in the invitation to bid. The specifications were detailed and complete with a warning to the bidders that a departure from the specifications would result in no payment and refusal of delivery. The specifications specifically required that the bucket on the boom have one open side. It was through this open side that [the worker] fell when he slumped unconscious in the bucket.

*Id.* at 593. The Court affirmed the trial court's grant of summary judgment to McCabe on negligence principles, not immunity: "We conclude that ordinarily

-24-

where a product is manufactured according to plans and specifications furnished by the buyer and the alleged defect is open and obvious, the manufacturer is protected from liability for injuries occasioned by use of the product." *Id.* QK4 may certainly invoke this defense against liability, but the fact that QK4 was employed by ACES, a contractor for the county, does not create a form of derivative sovereign immunity that absolutely shields QK4 from liability for negligence.

As with ACES, an expert opinion is required in order to determine whether QK4 performed its work negligently and consequently summary judgment is not appropriate at this stage. QK4 argues that the structural elements of the bridge were not "causative" of Leah Carter's injuries, but this has not been definitively established. The Estate argues that QK4 designed a bridge that should have been closed to the traveling public when water overtopped it, yet never communicated this expectation to those who would be responsible for protecting the public – the fiscal court, judge executive, and/or county road supervisor. Whether this argument has merit or not, it creates an issue of material fact which precludes summary judgment at this stage.

**IV. Issues of fact remain as to whether the removal of a portion of the guardrail was a superseding act absolving ACES and QK4 of liability**

Finally, the Estate challenges the trial court's ruling that the removal of a portion of the guardrail by the county was a superseding act that absolved ACES and QK4 of any liability for Carter's death. In the trial court's view, even if

ACES or QK4 were negligent in any way in their design of the bridge and its approaches, the removal of the guardrail was a superseding cause absolving them of any liability. A superseding cause "breaks the chain of causation so that an otherwise negligent actor is relieved from liability. While the act of a third-party may be an intervening cause, it is a superseding cause only when the act is 'extraordinary' and of an 'unforeseeable nature.'" *Howard v. Spradlin*, 562 S.W.3d 281, 287 (Ky. App. 2018) (citation omitted). A superseding cause has the following characteristics:

> 1) an act or event that intervenes between the original act and the injury;
>
> 2) the intervening act or event must be of independent origin, unassociated with the original act;
>
> 3) the intervening act or event must, itself, be capable of bringing about the injury;
>
> 4) the intervening act or event must not have been reasonably foreseeable by the original actor;
>
> 5) the intervening act or event involves the unforeseen negligence of a third party [one other than the first party original actor or the second party plaintiff] or the intervention of a natural force;
>
> 6) the original act must, in itself, be a substantial factor in causing the injury, not a remote cause. The original act must not merely create negligent condition or occasion; the distinction between a legal cause and a mere condition being foreseeability of injury.

*Id.* (quoting *NKC Hospitals, Inc. v. Anthony*, 849 S.W.2d 564, 568 (Ky. App. 1993)).

In *Howard v. Spradlin*, *supra*, Spradlin frequently left his truck in a grocery store parking lot after hours. His wife worked at the store and Spradlin was a friend of the store operators, the Howards. A third party broke into his truck one night, stole some firearms, ammunition, and a toolbox, then burned the truck to cover the crime. The grocery store caught fire and the building was destroyed. The Court held that Spradlin was relieved of any liability: "Even if we assume Spradlin breached any duty owed to the Howards, the intervening and superseding intentional or criminal acts of the unknown third-party broke whatever weak chain of causation the Howards could establish." *Id.* at 289. The *Spradlin* Court held that the criminal acts of the unknown third party were an intervening and superseding act because they were not reasonably foreseeable. *Id.*

The Estate argues that the removal of the guardrail was not a superseding cause because, unlike the truck break-in and fire, it was reasonably foreseeable. But the real difficulty here relates to the third characteristic listed above: the intervening act or event must, itself, be capable of bringing about the injury. In *Spradlin*, there was no doubt that the truck fire caused the grocery store to burn down. In the record before us, issues of material fact remain as to whether the removal of the guardrail brought about Carter's injury.

The Estate's experts opined that the guardrail would have kept

Carter's car from being swept from the bridge. In his report, Dr. Blackler opined

that

> the maximum depths over the bridge during the peak of
> the storm were less than 3 feet. The guard rail that was
> cut, was designed to be 2 feet 4 inches tall (2.33 feet).
> Had this guard rail been in place, it would have been able
> to keep the vehicle from sliding off the road during
> overtopping and able to keep the car on the road through
> the duration of the storm event.

Dr. Dorothy's report opined that

> Guardrails are specifically designed to contain and
> redirect vehicles under conditions of significantly greater
> force than would be experienced by a vehicle sliding
> against the guardrail during an overtopping event. As
> such, it would clearly have had a positive impact of
> containing a vehicle on the approach and bridge until
> water reached a depth sufficient to either topple, slide, or
> float the vehicle over the guardrail. Since the depth of
> the water in the subject incident was not sufficient to do
> this, if the guardrail that had been designed and installed
> as part of the Lyons Bridge construction had been present
> at the time of the subject incident, it is more likely than
> not that Ms. Carter's vehicle would have been contained
> on the bridge, allowing the rescue of Ms. Carter in a
> timely fashion, as opposed to the fatal result that befell
> Ms. Carter due to the unwarranted removal and
> foreshortening of the guardrail.

On the other hand, Kent Gilley and Jeff Arnold of ACES testified that

the guardrail was not intended to keep cars on the bridge in the event of a flood.

Roger Wade, the designer of the bridge, had never considered water in his analysis

of the function of the guardrails and testified that if the flood water was over the guardrails, it would not keep a vehicle from washing off the bridge.

Based on this contradictory evidence, issues of material fact exist as to whether the removal of the guardrail was a substantial factor in causing Leah Carter's death such as to render it an intervening, superseding cause. The trial court erred in granting summary judgment to ACES and QK4 on this basis.

## CONCLUSION

The Monroe County Fiscal Court, County Judge Executive, Magistrates, and road supervisor are entitled to sovereign immunity in their official capacities. The County Judge Executive and Magistrates are not entitled to legislative immunity; the County Judge Executive, the Magistrates, and the County Road Supervisor are not entitled to qualified official immunity; ACES and QK4 are not entitled to sovereign, governmental, or qualified official immunity; and finally, disputed issues of material fact remain as to whether a superseding act absolved ACES and QK4 of potential liability. Consequently, the trial court's grant of summary judgment is affirmed in part, reversed in part, and the case is remanded for further proceedings.

ALL CONCUR.

BRIEFS FOR APPELLANT:

J. Dale Golden
Laraclay Parker
Alexandra DeMoss-Campbell
Lexington, Kentucky

BRIEF FOR APPELLEES MONROE
COUNTY DEFENDANTS :

Charles E. English Jr.
Aaron C. Smith
J.A. Sowell
Bowling Green, Kentucky

BRIEF FOR APPELLEE ARNOLD
CONSULTING AND
ENGINEERING
SERVICES, INC.:

B. Scott Jones
Louisville, Kentucky

BRIEF FOR APPELLEE QK4, INC.:

John D. "Chip" Clay
Louisville, Kentucky